IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THEODORE B. SAVAGE, et al.        :
        Plaintiffs,

                                      CIVIL ACTION
    v.                       :       NO.  05-2551

CHUCKY JUDGE, et al.
        Defendants.        :

**MEMORANDUM**

**Jones, J.**                                                                                    **July 8, 2009**

**I.**   **Introduction**

The above-captioned matter involves Inmate Plaintiffs Theodore B. Savage and Edward K. Abraham's allegations of civil rights violations by various prison officials.  Namely, Plaintiffs alleged that they were retaliated against by said officials, for filing two prior lawsuits against these and other prison personnel.  Defendants have filed a Motion for Summary Judgment and for the reasons which follow, said Motion will be granted in part and denied in part.

Plaintiffs initially filed their Complaint on June 28, 2005.[1]  (Doc. No. 6) Defendants filed a Motion to Dismiss in response thereto.  (Doc. No. 13)  However, after seeking several extensions of time within which to file a response,[2] Plaintiffs filed a Motion to Stay Proceedings,

---

[1]In August of 2003, four plaintiffs, including Savage and Abraham, commenced suit (*Wheeler v. Beard,* Civil Action No. 03-CV-4826) against various prison officials, claiming that said officials were retaliating against them for filing a prior lawsuit (*Fontroy v. Schweiker,* Civil Action No. 02-2949).  In May of 2005, Plaintiffs commenced the instant action, claiming retaliation by prison officials as a result of two prior lawsuits.

[2]  Plaintiff Theodore Savage had been placed in Restrictive Housing, therefore the court provided Plaintiffs with thirty days from his release therefrom, within which to respond to Defendants' Motion.

1

which was granted by the Honorable Mary A. McLaughlin on February 21, 2006.  (Doc. No. 21)

On June 28, 2006, Plaintiffs filed their Response to Defendants' Motion to Dismiss, along with

an Amended Complaint.  (Doc. Nos. 29, 30) Defendants filed a Reply to Plaintiffs' Response and

on July 5, 2006, Judge McLaughlin denied Defendants' Motion as moot.  (Doc. No. 34)  On

August 4, 2006, Defendants filed a Motion to Dismiss Plaintiffs' Amended Complaint.  (Doc.

No. 38) On August 29, 2006, Plaintiff James S. Pavlichko voluntarily dismissed all of his claims

against Defendants.  (Doc. No. 42) After several more Responses, Replies and newly-filed

Motions to Dismiss, said Motions were granted with respect to: (1) Plaintiff Savage's retaliatory

restricted housing unit placements and retaliatory prison transfer claims; (2) the Conspiracy claim

against Defendants Judge, Matello, Canino, Murray and Trojan; and, (3) all claims against

Defendants Moyer, Owen and Williamson.  (Doc. No. 57)

Defendants filed their Answers to Plaintiffs' Amended Complaint and Plaintiffs

ultimately dismissed Defendant Kovalchik from the case. (Doc. Nos. 61, 64, 70)  Discovery

commenced and on November 19, 2007, Defendants Kopinski, Thomas, Johnson, Radle, Smith,

DiGuglielmo and Dohman filed a Motion for Summary Judgment. (Doc. No. 84)  That same day,

Plaintiffs motioned to amend/correct their Amended Complaint.  (Doc. No. 86).  Plaintiffs also

sought appointment of counsel or alternatively, a stay of Defendants' Motion for Summary

Judgment pending further discovery.  On November 27, 2007, Judge McLaughlin ordered further

discovery and directed that in view of the extensive wait list for appointment of counsel,

Plaintiffs were to advise her within two weeks as to whether or not they wished to proceed with

appointment and have the matter placed in suspense.  (Doc. No. 89) Plaintiffs responded

affirmatively and on December 7, 2007, the Clerk was directed to obtain counsel for Plaintiffs

2

and their case was placed in suspense.

On May 16, 2008, Attorney Lawrence E. Woods was appointed to represent Plaintiffs and on May 27, 2008, the case was removed from suspense.  (Doc. Nos. 94, 95)  Counsel subsequently moved for an extension of time to file a Response to Defendants' Motion for Summary Judgment, ultimately filing said Response on October 15, 2008.  (Doc. No. 100)  On November 13, 2008, the within matter was referred to this Court for further proceedings.  (Doc. No. 103).  Over the course of the next several months, further supplements and replies were filed by both parties.  (Doc. Nos. 104, 105, 106).  The matter is now ripe for review.

## II.    Undisputed Facts[3]

In January of 2006, Plaintiffs Theodore Savage (hereinafter "Savage") and Edward Abraham (hereinafter "Abraham") shared cell B-2011 on Graterford's L-Unit, a Restricted Housing Unit ("RHU").  (Doc. Nos. 85 & 106, ¶ 1).  On January 6, 2006, Correction Officer Weaver wrote Misconduct Report #757280, which stated that he had removed a playing card that was obstructing the wicket locking apparatus on Plaintiffs' cell and Plaintiff Abraham became agitated.  Later that day when Weaver was collecting razors and mirrors from the inmates, he observed the same obstruction.  When Weaver went to remove the card, he felt a substance on his left hand, at which time Abraham reportedly said "Yeah, it's cum Weaver, get the fuck out of here asshole.  You can lick it and taste it."  (Doc. Nos. 85 & 106, ¶ 2)  The DOC Hearing

---

[3] As a procedural matter, Defendants take issue with the fact that Plaintiffs have failed to follow court procedures regarding citation to the record in support of disputed facts.  Although Plaintiffs herein have not provided specific citations in support of their disputed facts, they have attached supportive documentation to their Memorandum in Response.  It is within this Court's discretion to excuse this procedural deficiency and consider the instant motion on the merits, which this Court has done.

Examiner ultimately found Abraham guilty of the misconduct charges set forth in Report #757280 and sanctioned him to 90 days in disciplinary custody. (Doc. Nos. 85 & 106, ¶ 4)

That same day, Weaver informed Defendants Smith and Kopinski (L-Unit Lieutenant and Sergeant, respectively) of the incident and said Defendants decided to have Abraham moved to a more secure cell within the Unit.  (*Radle Decl.* at 11; *Kopinski Decl.* ¶ 7) Accordingly, Defendant Kopinski, along with two correctional officers, Defendants Thomas and Johnson, went to Abraham's cell to commence the move to Cell C-111, which had a secure pass way wicket system designed to prevent an inmate from obstructing the locking apparatus and making it virtually impossible for an inmate to assault staff through the aperture, if used properly. (Doc. Nos. 85 & 106, ¶ 8; *Kopinski Decl.* ¶ 9 ) On this day, Abraham sustained an injury to his head. (Doc. Nos. 85 & 106, ¶ 24)

On January 6, 2006 at approximately 6:25 p.m., Abraham was given a copy of Misconduct Report No. A740561.  (Doc. Nos. 85 & 106, ¶ 31) In Misconduct Report No. A740561, Defendant Thomas wrote that while escorting Abraham that day, Abraham "became combative and non-compliant, he called me a bald headed nigger, kicked me on my right leg and tried to spit in my face.  At that time he was taken to the ground and was immediately carried to his cell with the least amount of force necessary." (Doc. Nos. 85 & 106, ¶ 32)[4] The DOC Hearing Examiner found that Abraham was guilty of the misconduct and sanctioned him to 90 days disciplinary custody.  (Doc. Nos. 85 & 106, ¶ 33)  Savage subsequently told Defendant

---

[4]  Plaintiffs admit that the Misconduct Report alleged as Defendants contend but deny the truthfulness of the contents.  (Doc. No. 106, ¶ 32)

4

Smith that he wanted to move to C Wing with Abraham.  (Doc. Nos. 85 & 106, ¶ 38)[5]

On January 18, 2006, Abraham was moved from L-Unit to J-Unit by the Program Review Committee.  (Doc. Nos. 85 & 106, ¶ 47)[6]  By letter dated January 18, 2006, Savage told Defendant DiGuglielmo (hereinafter "DiGuglielmo") that he and Abraham had been physically abused by L-Unit staff, and requested to be moved to J-Unit to be with Abraham to conduct their joint litigation and to prevent retaliatory assault by L-Unit staff.  (Doc. Nos. 85 & 106, ¶ 48)

On January 20, 2006, DiGuglielmo, Graterford's Superintendent, received Savage's allegation of abuse by L-Unit staff.  (Doc. Nos. 85 & 106, ¶ 49) DiGuglielmo referred Savage's allegation of abuse to Michael Lorenzo, Graterford's Deputy Superintendent for Internal Security, who in turn assigned the matter to Defendant Radle, a Security Lieutenant, for investigation.  (Doc. Nos. 85 & 106, ¶ 50) After Savage made his allegation of abuse, he too was transferred to J-Unit.  (Doc. Nos. 85 & 106, ¶ 52) Other than the fact that both L-Unit and J-Unit are Restricted Housing Units, there is no other real difference between them.  (Doc. Nos. 85 & 106, ¶ 53)  DiGuglielmo gave Savage and Abraham permission to attend the law library together and on each day from February 9 to February 14, Savage and Abraham did attend the law library

_____

[5]  Plaintiff Savage also alleges that on January 17, 2006, he was assaulted by Corrections Officer Johnson in retaliation for his litigation.  However, the facts regarding the incident are disputed with the exception of the following: when Defendant Smith was making the his rounds of the L-Unit where Savage was housed on January 17, 2006, Savage did not complain to him that he had been assaulted and when Defendant Kopinski returned to work on January 17, 2006, Savage did not tell him, either verbally or in writing, that Defendant Johnson had assaulted him.  (Doc. Nos. 85 & 106, ¶¶ 44, 46)

[6]  Plaintiffs admit to the fact that the move occurred, but deny the manner in which Defendants have phrased this averment, claiming that they omitted information that Abraham was advised he was being moved at the request of Defendant Dohman.  (Doc. No. 106, ¶ 47)

together.[7]  (Doc. Nos. 85 & 106, ¶¶ 56, 60)

By memorandum dated February 13, 2005,[8] Radle detailed Plaintiffs' allegations of abuse and the steps he had taken in his investigation, including but not limited to his interviews with Savage, Abraham, Smith, Kopinski, Johnson, and Thomas.  (Doc. Nos. 85 & 106, ¶ 61) Radle's Report stated as follows:

(a)     On January 6, 2006, Abraham accidentally put hair conditioner on the wicket of the cell door.  CO Weaver touched the hair conditioner as he was collecting razors and mirrors from the inmates on the Unit and Abraham stated in a playful manner that the substance was a bodily fluid;

(b)     Approximately half and hour later, Kopinski, Johnson and Thomas arrived at cell LB 2011 and ordered Abraham to cuff up;

( c)     Abraham asked where he was going and what was going on, and was again ordered to come to the door to cuff up;

(d)     Kopinski yelled for the cell door to be opened and the officers "bum rushed" Abraham;

(e)     Johnson pushed Abraham in the body;

(f)     Thomas grabbed Abraham by the back of his hair, causing Abraham to hit his head off [sic] the wall and bed frame;

(g)     Savage saw blood on Abraham's right eye;

(h)     The officers carried Abraham across the top of B wing and down the stairs;

---

[7]  Plaintiffs deny the following facts "as stated": "On or about February 6, 2006, defendant DiGuglielmo gave permission to Savage and Abraham to attend the J-Unit law library together to work on their joint litigation."  (Doc. No. 85, ¶ 56) Instead, Plaintiffs state that "Savage filed a grievance, which resulted in DiGuglielmo approving Savage and Abraham to attend the law library together."  (Doc. No. 106, ¶ 56).

[8]  The original correspondence was mistakenly dated February 13, 2005; the date was actually February 15, 2006.  (Doc. No. 85, ¶ 61)

(i)     Later, an officer whom Savage refused to identify, escorted Savage to Abraham's new cell, and Savage observed a cut over Abraham's eye;

(j)     Savage instructed Abraham not to seek medical attention;

(k)     On January 17, 2006, Johnson approached Savage's cell and made a threatening statement, which Savage could not recall;

(l)     Johnson ordered the control room to open Savage's cell, then entered Savage's cell and struck him in the back of the head with a closed fist, then punched him in the kidney area;

(m)     Johnson told Savage that he would have him killed and he would never see his family again;

(n)     Savage then stated that his intention was to get a pen to "poke" Johnson in the face, adding "that's what I would have done if he had entered the cell"; and,

(o)     Savage admitted that he did not seek medical attention, stating that he did not want medical attention until after he had written to the Superintendent.

(Doc. Nos. 85 & 106, ¶ 62)[9]

On January 26, 2006, Radle conducted a tape-recorded interview of Abraham, a summary of which follows:[10]

(a)     CO Weaver had removed a playing card form the wicket, and the card had a substance on it which Weaver believed was a male bodily fluid;

(b)     Abraham denied telling Weaver "Yeah Weaver, it's cum";

---

[9]  Plaintiffs do not dispute that the Report contains the foregoing information.  However, they do dispute the truth of the contents.  (Doc. No. 106, ¶ 62)

[10]  Plaintiffs do not dispute that the written summary of Radle's tape-recorded interview with Abraham contains the following information.  However, they do deny the contents as containing untrue facts.  (Doc. No. 106, ¶ 63)

7

(c)     Later that day, Kopinski, Johnson and Thomas arrived at his cell and ordered him to be handcuffed;

(d)     Abraham responded by asking, "Where am I going?";

(e)     Abraham was again directed to submit to being handcuffed;

(f)     As Abraham was turning around, Kopinski asked for the cell door to be opened;

(g)     Once the door was opened, Kopinski and Thomas grabbed him;

(h)     Abraham was pushed up against the side of the bed, taken to the floor, and carried out of the cell;

(i)     The officers carried him across the top of B Wing and down the stairs;

(j)     Thomas had hold of Abraham's hair, while Kopinski carried him by the legs;

(k)     As they entered the kitchen area on L Unit, Thomas threw Abraham into the metal trays that are used in the kitchen, which is how his eye was cut, and he was dropped, causing his face to hit the floor;

(l)     Johnson hit him twice in the back of the head, causing him to black out;

(m)     Thomas fell down, dropping Abraham again;

(n)     Abraham was then carried across C Wing and placed into cell L C - 1011; and,

(o)     Abraham said he submitted a sick call slip to be evaluated by medical staff, which was never answered, and attempted to get the attention of nursing staff making the rounds of the Unit, but they ignored his requests.

(Doc. Nos. 85 & 106, ¶ 63)

8

At the time of Abraham's interview, Radle observed that Abraham had a small cut above his right eye.  (Doc. Nos. 85 & 106, ¶ 64)

Contained within Radle's investigative report, were the following discrepancies between Savage's and Abraham's accounts of the alleged assault of Abraham:

> (a)     Savage said that the officers assaulted Abraham before moving him from the cell, and that Abraham's eye was cut when Thomas grabbed his hair causing Abraham to hit the bed frame. Abraham did not state that he had been assaulted in the cell, but said that the officers had assaulted him in the kitchen and that his eye was cut when Thomas threw him onto the metal trays; and,

> (b)     Savage said that "nurse Sally" saw Abraham on C Wing. Abraham stated that medical staff ignored him.

With respect to Savage's allegation that Johnson had assaulted him, Radle's report noted the following discrepancies:

> (a)     Savage first said that Johnson had entered his cell and punched him in the head and kidneys;

> (b)     Savage then said that he would have poked Johnson in the face with a pen "If [Johnson] had entered the cell"; and,

> ( c)    In response to Radle's e-mail inquiry, Julia Knauer, Graterford's Health Care Coordinator, advised Radle that Savage had not requested medical care following the alleged assault.

(Doc. Nos. 85 & 106, ¶ 65)[11]

On February 13, 2006, Donald Williamson, the Diagnostic and Classification Coordinator for the DOC's Bureau of Inmate Services in Camp Hill, Pennsylvania, approved a separation

---

[11]  Plaintiffs do not dispute that the Report contains the foregoing information.  However, they do dispute the truth of the contents.  (Doc. No. 106, ¶ 65)

transfer between Savage and Abraham. (Doc. Nos. 85 & 106, ¶ 71) After the official separation was filed, Savage and Abraham could no longer be allowed to attend the law library together. (Doc. Nos. 85 & 106, ¶ 73) On February 21, 2006, Abraham was transferred from Graterford to the State Correctional Institution at Rockview, where he is currently confined.  (Doc. Nos. 85 & 106, ¶ 74)[12]

### III.    Discussion

The standard for assessing a Motion for Summary Judgment is well-settled:

> A court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has further ruled that a "genuine" issue exists if "the evidence is such that a reasonable jury could return a verdict for the non-moving party," and a factual dispute is "material" when it "might affect the outcome of the suit under the governing law."
>
> In considering a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." In a summary judgment motion, the moving party has the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. The party opposing the motion, however, cannot rely merely upon bare assertions, conclusory allegations, or suspicions to support its claim.

*Sentry Select Ins. Co. v. LBL Skysystems (U.S.A.), Inc.*, 486 F. Supp. 2d 496, 506 (E.D. Pa. 2007)(citations omitted).

------

[12]  For reasons which are wholly material to this action and will be discussed more fully hereinbelow, it is important to note that as a final undisputed fact, both parties agree that DOC Administrative Directive 801, which is included in the Inmate Handbook and may be found on the DOC's official website under "DOC Policies," prohibits inmates from having sex with each other or anyone else.  (Doc. Nos. 85 & 106, ¶ 76)

In the Motion for Summary Judgment presently before this Court, Defendants contend that no genuine issues as to any material facts exist, which would entitle Plaintiffs to relief. Upon review of all documents submitted by both parties, this Court finds that there is a primary issue relevant to the validity of several of Plaintiffs' claims, which constitutes a genuine issue of material fact. Namely: whether or not a sexual relationship existed between Savage and Abraham and whether said alleged relationship was the basis for and/or warranted the conduct complained of by Plaintiffs.

### a.   Alleged Separation and Transfer in Retaliation for Pending Litigation

Plaintiffs have alleged that Defendants retaliated against them by ordering separations and transfers, allegedly in response to Plaintiffs litigating other claims against prison officials and filing new complaints within the institution.

It is well-settled that:

> To make out a prima facie case for retaliation against prison officials, an inmate must prove that (1) he engaged in constitutionally protected conduct; (2) he suffered "adverse action" at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to discipline him. Then the burden shifts to the defendant to prove by a preponderance of the evidence that he would have taken the same disciplinary action even in the absence of the protected activity.

*Rauso v. Sutton*, 2004 U.S. Dist. LEXIS 8986, at *15 (E.D. Pa. Mar. 30, 2004)(citations omitted).

As a basis for their contention that no Section 1983 violation occurred in this case, Defendants reject any notion that their actions were motivated by Plaintiffs' pending litigation, but instead rely upon the proposition that Plaintiffs were engaged in a homosexual relationship which warranted the action ultimately taken by prison personnel. In support of same, they submit a Declaration from Lieutenant William Radle, as well as numerous "love" letters that were

11

allegedly authored by Plaintiffs to one another.  (Doc. No. 85, Ex. 5, ¶8, 189-275, 278, 281, 283-

403)[13] However, Plaintiffs deny any such relationship, claiming that they did not author any such

letters, the letters were not in their respective handwriting, and the letters were "planted" in their

cell.  (Doc. No. 100, Exs. P-5, P-6) Additionally, Plaintiffs provide the affidavits of  Savage's

wife, who avers that the letters were not in her husband's handwriting and that he is not a

homosexual, as well as the Affidavits of  Mr. Aaron Wheeler, Mr. Derrick Fontroy and Mr.

William Meyer, who all aver that they personally know Plaintiffs and know that they are not

homosexuals.  (Doc. No. 100, Exs. P-2, P-3, P-4, P-14)[14]  Defendants assert that "once defendant

Radle discovered the letters demonstrating that Abraham and Savage were involved in a

homosexual relationship, he recommended that they be kept separated."[15]  (Doc. No. 85 at 5, Ex.

5*, ¶ 8) They further contend that "[t]he numerous love letters between Abraham and Savage

speak for themselves" and that the homosexual relationship was a Class I Charge requiring

formal resolution. (Doc. 84 at 5; Doc. No. 85, Ex. 12)  As such, Defendants maintain that the

---

[13]  In a tape-recorded statement by Lieutenant Henry (Hank) Smith, who was in charge of L-Unit during the time of the alleged assault of Abraham, Lieutenant Smith stated that Savage had told him that he wanted Abraham moved back into the same cell because they had been friends for so many years and felt comfortable being in the cell together.  Smith stated that although he thought Abraham and Savage were "[k]inda close," he had "[n]ever seen them in the act or anything."  (Doc. No. 85, Ex. 5 at 108-109)

[14]  In Defendants' Reply to Plaintiffs' Response in Opposition to Their Motion for Summary Judgment, they reiterate their contention that the letters are necessarily authentic and that said letters provided a reasonable basis for Defendants' conduct.  (Doc. No. 105 at 2-4) However, this Court was unable to find any evidence of record to establish that Plaintiffs were *formally* charged with this inappropriate activity prior to Abraham's transfer.

[15]  Lieutenant Radle stated that as part of his investigation beginning on January 20, 2006, he had Defendants' cell searched, at which time the letters were found.  (Doc. No. 85, Ex. 5, ¶¶ 6-7)

12

action taken was within their broad discretion, thereby justifying the separation and transfer decisions.[16]  (Doc. No. 84 at 7)

It is not the function of this Court to make credibility determinations or resolve factual disputes when ruling on a motion for summary judgment. *See Siegel Transfer v. Carrier Express*, 54 F.3d 1125, 1127 (3d Cir. Pa. 1995).  Instead, this Court must view the facts as presented in a light most favorable to the party opposing summary judgment.  Inasmuch as genuine issues as to material facts remain, i.e., the existence of a homosexual relationship and whether that was actually the basis for separating Plaintiffs, summary judgment cannot be granted on the grounds asserted by Defendants.

Defendants further contend that even if Plaintiffs have stated a *prima facie* retaliation claim in connection with the separations, the record demonstrates that said decisions were made for legitimate penological reasons.  (Doc. No. 84 at 5)  Namely, Defendants assert that Plaintiffs were moved from L-Unit to J-Unit  after they made allegations of abuse against L-Unit staff and, again, that it was reasonable to separate Plaintiffs in light of their sexual relationship, which violated DOC rules.  *Id.* at 5-6.  As noted hereinabove, Plaintiffs vigorously deny all allegations

---

[16]  In the DOC's "Misconducts" Report regarding Abraham which was dated February 2, 2006, there was no formal charge of "Engaging in sexual acts with others or sodomy."  (Doc. No. 85, Ex. 5 at 140-143; Ex. 12) However, on an "Inmate Inquiry" dated May 24, 2007, there is an entry regarding the reason Abraham and Savage were separated: "Inmates Abraham and Savage were involved in a sexual relationship.  Love letters were intercepted between the two where [sic] they were attempting to make arrangements for physical contact."  Said entry was made on February 14, 2006.  (Doc. No. 85, Ex. 10) This Court notes that although the alleged sexual relationship was cited as a "reason," there was no formal charge of same.  This Court further notes a distinction between use of the term "intercepted" (which would indicate that said inmates were in the process of exchanging said letters when prison officials took possession of them) and the term "confiscated," which Lieutenant Radle used to describe the manner in which miscellaneous paperwork was taken, pursuant to a search of Plaintiffs' cell.  (Doc. No. 85, Ex. 5)

of a sexual relationship and provide affidavits to dispute the legitimacy of the letters and to establish that no such relationship existed.  Moreover, the record as provided by Defendants does not establish that Plaintiffs  were ever formally charged - before the fact - with "Engaging in sexual acts with others or sodomy."

Even relying solely on Abraham's assault with a bodily fluid against Defendant Weaver as a legitimate penological reason for moving him to another cell, there is evidence to establish that as Abraham was being removed from his cell, Defendant Thomas stated "file more paperwork, you fucking piece of shit."  (Doc. No. 100, Ex. P-5, ¶ 2; Ex. P-6, ¶ 2).[17]  As such, a genuine issue exists regarding this material fact, which could directly establish motivation and demonstrate whether Defendants would have taken the same disciplinary action in the absence of Plaintiffs' pending litigation.

### b.    Alleged Assault in Retaliation for Pending Litigation

Defendants assert that no reasonable jury could find that they assaulted Plaintiffs on account of their pending litigation because Defendants Kopinski, Johnson and Thomas were unaware of said litigation.  (Doc. No. 84 at 7)  Inasmuch as this contention is directly disputed by reason of a cautionary Order issued by the Honorable William H. Yohn, Jr. on October 12, 2005 in the *Wheeler* case (reminding prison officials at SCI-Graterford that any retaliatory conduct against Plaintiffs as a result of their pending litigation would be unlawful), Defendants' claim of lack of knowledge is unfounded.  (Doc. No. 100, Ex. P-7)

---

[17]  This Court notes that in preparation of his extensive Investigative Report regarding the allegations of abuse by Plaintiffs, Lieutenant Radle interviewed five staff members regarding the January 6, 2006 incident but did not interview the person upon whom the underlying assault allegedly occurred: Corrections Officer David Weaver.  (Doc. No. 85, Exh. 5)

With regard to Defendants' second contention that no assaults even occurred,[18] this Court finds that genuine issues as to material facts regarding the January 6, 2006 incident exist which would preclude summary judgment.  Aside from Plaintiffs' respective Affidavits containing details of the assault, inmate Darren Miller averred that he personally witnessed the assault of Abraham by prison officials on January 6, 2006.  (Doc. No. 100, Ex. P-1) Additionally, Lieutenant Radle did not dispute the fact that when interviewing Abraham regarding the alleged assault, Abraham had a cut over his right eye. (Doc. Nos. 85 & 106, ¶ 64)

     **c.**    **Conspiracy**

The standard for establishing a conspiracy as alleged by Plaintiffs, is as follows:

> In order to state a claim for conspiracy under § 1983, the plaintiff must demonstrate (1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy. A conspiracy has been defined in other contexts as "a combination between two or more persons to do an unlawful act, or to do a lawful act by unlawful means, or to accomplish an unlawful purpose." To prevail on a conspiracy claim, the plaintiff must present evidence of an agreement -- "the sine qua non of a conspiracy," -- as it is "not enough that the end result of the parties' independent conduct caused plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism."

*Eichelman v. Lancaster County*, 510 F. Supp. 2d 377, 392-393 (E.D. Pa. 2007)(citations omitted).

---

[18]  Defendants base this contention in part on the discrepancies Lieutenant Radle found between Abraham and Savage's versions of the events.  (Doc. No. 84, Exh. 5)  However, Plaintiffs have provided sufficient documentation to establish that a genuine issue exists as to these material facts. Defendants further base this contention on the love letters confiscated by Lieutenant Radle.  For the reasons set forth hereinabove, said letters are not dispositive of the issue at this stage of the proceedings.

Furthermore,

> In order to set forth a cognizable conspiracy claim, a plaintiff cannot rely on broad or conclusory allegations. The Court of Appeals for the Third Circuit has further noted that "[a] conspiracy claim must . . . contain supportive factual allegations." Moreover, "to plead conspiracy adequately, a plaintiff must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose."

> The essence of a conspiracy is an agreement or concerted action between individuals. Consequently, a plaintiff must allege with particularity and present material facts which show that the purported conspirators reached some understanding or agreement or plotted, planned and conspired together to deprive plaintiff of a protected federal right. Where a civil rights conspiracy is alleged, there must be some specific facts in the complaint which tend to show a meeting of the minds and some type of concerted activity.  A plaintiff cannot rely on subjective suspicions and unsupported speculation.

*Wilkins v. Bittenbender*, 2006 U.S. Dist. LEXIS 20179 at **52-54 (M.D. Pa. Mar. 31, 2006)(citations omitted),  *appeal dismissed,* 2007 U.S. App. LEXIS 5480 (3d Cir. Pa. Mar. 7, 2007).

In support of their Conspiracy claim, Plaintiffs point to conduct allegedly committed by Defendants on an individual basis.  They further state that "[t]he facts in Plaintiffs' Amended Complaint support the conspiracy claims . . . " and cite to the decision of the Honorable Mary McLaughlin, denying Defendants' Motion to Dismiss Plaintiffs' Conspiracy claim based upon the pleadings.  (Doc. No. 104 at 8)  However, the standard for defeating a Summary Judgment Motion is much more stringent than that utilized in assessing Motions to Dismiss.  It is well-settled that a party opposing a motion for summary judgment "[m]ust point to specific, affirmative evidence in the record and not simply rely on allegations or denials in the pleadings. If the opposing party does not carry this burden, then summary judgment should be granted. All doubts are resolved in favor of the opposing party." *Pearson v. Vaugh*, 984 F. Supp. 315, 316

16

(E.D. Pa. 1997)(citations omitted).

Nothing in the record supports Plaintiffs' contention that Defendants conspired to enter their cell with an intent other than to perform the task of transferring Abraham from one cell to another. Without some evidence in support of their allegations, this Court cannot find that a conspiracy existed to utilize excessive force, assault Abraham, or otherwise deprive Plaintiffs of their rights under Section 1983. In particular, the record relied upon by Plaintiffs is devoid of any evidence that an agreement existed by and between Defendants. Plaintiffs contend that "[w]ithout further discovery, it is not possible to say that X and Y spoke together about harassing the Plaintiffs." (Doc. No. 100 at 6) Inasmuch as the parties have had more than ample opportunity to conduct discovery, Plaintiffs' purported reason for the lack of evidence of record in support of their Conspiracy claim is unpersuasive. Accordingly, Defendants are entitled to summary judgment on this claim.

### d.      Excessive Force

Plaintiffs have alleged that Defendants violated their Eighth Amendment rights by using excessive force on two occasions. (Doc. No. 30, ¶¶ 96-102, 117-123) Defendants contend that summary judgment is appropriate on these claims because "the Eighth Amendment does not protect against *de minimus* uses of force" and because "[a] single, isolated use of force does not rise to the level of a constitutional violation." (Doc. No. 84 at 10-11)  In support of their *de minimus* argument, Defendants rely upon *Brooks v. Kyler,* 204 F.3d 102, 107 (3rd Cir. 2000). However, Plaintiffs note that although the injury in *Brooks* only consisted of a few abrasions, the Court found the force used to be wanton and unnecessary and that said force resulted in severe pain, thereby entitling the claim to consideration by a jury. (Doc. No. 100 at 6-7) Plaintiffs claim

that the same analogy can be made here, therefore summary judgment is inappropriate.

When evaluating a claim of excessive force by prison officials, the court must . . .

> [C]onsider "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." [T]he infliction of pain during a prison security measure does not necessarily violate the cruel and unusual punishment clause even if "it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense."

> In determining whether a use of force is excessive, courts should consider the need for the force, the relationship between the need and the amount of force used, the extent of the injury, and the "extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." In order to carry his or her burden as to the objective component of an excessive force claim, however, an inmate need not demonstrate the existence of a significant injury.

*Blackiston v. Johnson*, 1994 U.S. Dist. LEXIS 18578, at **14-15 (E.D. Pa. Dec. 30, 1994)

(citations omitted).

In the instant matter, Plaintiffs complain of the use of excessive force on two occasions: January 6, 2006 by Defendants Thomas, Johnson, Kopinski and Smith against Abraham, and January 17, 2006 by Defendant Johnson against Savage.

Regarding the January 6, 2006 incident, Lieutenant Kopinski averred that on that day, he was the Sergeant[19] in charge of the L-Unit where Plaintiffs were housed.  Shortly after his shift began, Defendant Weaver informed him that while he was collecting razors and mirrors from the inmates, Abraham assaulted him by throwing what Abraham described as "cum." (Doc. No. 85, Ex. 4, ¶ 5) Kopinski instructed Weaver to report to the medical department for an evaluation and to charge Abraham with misconduct.  *Id.* at ¶ 6.  Kopinski stated that as a result of Abraham's

---

[19]  Kopinski was promoted to Lieutenant in August of 2006.  (Doc. No. 85, Ex. 4, ¶1)

apparent assaultive behavior, he and L-Unit Lieutenant Henry Smith decided that Abraham should be moved to a more secure cell that would prevent him from throwing things out of the cell or assaulting staff.  *Id.* at ¶ 7.  Accordingly, Kopinski, along with Corrections Officers Thomas and Johnson, went to remove Abraham from his cell.  *Id.* at ¶ 9.  Kopinski stated that after exiting Abraham's cell, he became "combative" and began to struggle, at which point Kopinski, Johnson and Thomas took Abraham to the ground "[w]ith the minimum force necessary in order to subdue him."  *Id.* at ¶¶ 13-14.  According to Kopinski, once they were able to remove Abraham from the B-Wing, he stopped struggling and they proceeded through the kitchen area and to Abraham's new cell in the C-Wing without incident. *Id.* at ¶ 15.  However, upon leaving Abraham in his new cell, he began banging his head against the cell door and asked to speak to the Lieutenant.  *Id.* at ¶ 17.  Corrections Officers Johnson and Thomas reiterated essentially the same version of events during their interviews with Lieutenant Radle on January 30, 2006.  (Doc. No. 85, Ex. 5 at 80-99)

Contrary to Defendants' account of the incident, Abraham averred that during his transfer from one cell to another, Defendants assaulted him by pushing him up against the side of the bed, grabbing his hair, throwing him into metal kitchen trays, causing him to cut his eye and hit his face on the floor, and then hit him twice in the back of the head, causing him to black out. Abraham further stated that he was subsequently dropped before arriving at his new cell.   (Doc. No. 85, Ex. 5 at 4)  Darren Miller, an alleged witness to this "assault," stated that he observed Defendants "dragging" Abraham down some steps and that Defendant Thomas had Abraham by the hair, while Defendant Johnson had his hands around Abraham's neck and was choking him. (Doc. No. 100, Ex. P-1, ¶ 2) Miller further stated that Abraham's face was swollen and bloody

19

and that Johnson and Thomas began punching Abraham in the front and back of his head, despite any resistence from Abraham. *Id.* Defendants do not dispute the fact that Abraham sustained **a** cut above his right eye. (Doc. Nos. 85 & 106, ¶ 64)

Although Defendants have attested that they believed they used the minimum amount of force necessary to subdue Abraham, the two wholly divergent sets of facts presented by each side prevent this Court from concluding that there is no genuine issue as to any material facts regarding the need for any force, the amount of force actually utilized, and the extent of Abraham's injuries. Accordingly, Defendants are not entitled to judgment as a matter of law regarding the January 6, 2006 incident.

With respect to the January 17, 2006 incident, Savage told Lieutenant Radle that Corrections Officer Johnson entered his cell, threatened his life and punched him in the head and kidneys. (Doc. No. 85, Ex. 5 at 18, 10-13) In a subsequent Affidavit, Savage reiterated that Johnson entered his cell, punched him in the head and kidneys, and threatened to kill him if he became a witness regarding the assault on Abraham. (Doc. No. 100, Ex. P-6, ¶ 4) When Lieutenant Radle recited these facts to Defendant Johnson thirteen days later and asked "Do you recall any of that," Johnson responded "No sir." (Doc. No. 85, Ex. 5 at 86)

In support of their excessive force claim regarding Savage, Plaintiffs contend that although no visible wounds resulted, Savage suffered dizziness and pain. (Doc. No. 100 at 7) Defendants are seeking summary judgment, claiming in pertinent part that Savage withdrew his claim of abuse against Johnson. As proof of same, Defendants have provided a copy of documentation Savage sent to Defendant DiGuglielmo on February 6, 2006, entitled "Request for Withdrawal of Complaint." (Doc. No. 85, Exh. 5 at 128) Said fact is determinative of Savage's

claim, as:

> Under the Prison Litigation Reform Act ("PLRA"), exhaustion of administrative remedies is required for all actions concerning prison conditions brought under federal law. The "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.""The PLRA attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." "The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance."
>
> The PLRA mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."  Failure to substantially comply with procedural requirements of the applicable prison's grievance system will result in a procedural default of the claim. The PLRA "completely precludes a futility exception to its mandatory exhaustion requirement."

*Fortune v. Bitner*, 2006 U.S. Dist. LEXIS 68709, at \*\*19-21 (M.D. Pa. Sept. 25, 2006)(citations omitted), *aff'd,* 2008 U.S. App. LEXIS 15309 (3d Cir. Pa. 2008).  *See also Porter v. Nussle,* 534 U.S. 516, 524, 532 (U.S. 2002)(The PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong. Although once within the discretion of the district court, exhaustion in cases covered by the PLRA is now mandatory).

Accordingly, Defendants are entitled to summary judgment regarding Savage's January 17, 2006 claim of excessive force.

### e.    Qualified Immunity

Defendants next contend that they are immune from damage claims brought under Section 1983 by reason of qualified immunity.  (Doc. No. 84 at 13)  Plaintiffs respond by

asserting that Pennsylvania's governmental immunity statutes do not protect a person from the consequences of violating federal law."  (Doc. No. 100 at 7)

The court in *Underwood v. Mendez*, 2005 U.S. Dist. LEXIS 41577 (M.D. Pa. Sept. 9, 2005), discussed the application of qualified immunity to situations such as the one at bar:

> "The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." Despite their participation in constitutionally impermissible conduct, government officials "may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Qualified immunity operates to ensure that, before they are subjected to suit, officers are on notice that their conduct is unlawful. "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct."

*Id.* at **10-11 (citations omitted).

With regard to Underwood's retaliation claims, the court determined that:

> The defendants' qualified immunity argument is without merit. [R]etaliation against a prisoner for the prisoner's exercise of his right of access to the courts is a constitutional violation [and the] defendants have not characterized the plaintiff's allegations in a manner fairly consistent with the plaintiff's statement of those allegations and also consistent with the defendants' assertion of no violation of a clearly established right.

*Id.* at *12 (citations omitted).

In the instant matter, the issue of qualified immunity is moot with regard to both Plaintiffs' Conspiracy claims against Defendants and Savage's Excessive Force claim against Johnson, as summary judgment is being granted on same.  With regard to the remaining Retaliation claim, Plaintiffs' allegations, if true, would establish a constitutional violation. Moreover, Defendants herein have not conclusively established that they did not knowingly violate the law, as genuine issues of material fact exist regarding the purported reason for

Plaintiffs' separations and transfers: their alleged sexual relationship.

With regard to the excessive force claim by Abraham, Defendants have not yet established as a matter of law that they acted reasonably under the circumstances. If proven true, Abraham's allegations of excessive force would establish a constitutional violation. In that event, no "reasonable corrections officer[s]" in Defendants' respective positions could have believed that using more force than was necessary under the existing circumstances, would be lawful. *See Anderson v. Horn,* 1997 U.S. Dist. LEXIS 3824, at *28 (E.D. Pa. Mar. 28, 1997).

Accordingly, Defendants are not entitled to qualified immunity regarding either of these claims at this point in time.

### f.      Sovereign Immunity

The last contention raised by Defendants in their Motion for Summary Judgment, is that "sovereign immunity, without exception," bars Plaintiffs' pendent state law claims for Assault and Battery because Defendants were acting within the scope of their employment. (Doc. No. 84 at 18) In support of this claim, Defendants cite to Plaintiffs' Amended Complaint to establish that Plaintiffs themselves indicated that Defendants were at all times, acting within the course of their employment as correctional officers.[20] *Id.*

When the Honorable Mary A. McLaughlin assessed Defendant Thomas' sovereign immunity claim as raised in a Motion to Dismiss Plaintiffs' Amended Complaint, she determined that she could not - at that stage of the litigation, "[f]ind as a matter of law that Thomas' actions occurred within the scope of his employment as an SCI-Graterford corrections officer."

---

[20] Plaintiffs' Amended Complaint actually alleges that each defendant was "[a]n adult individual employed by the DOC *.*.*.* with his principle place of business located at Box 246, Route 29, Graterford, Pennsylvania 19426." (Doc. No. 85, Ex. 1, ¶¶ 12, 14-17, 20-21)

Accordingly, this Court cannot find that Defendants' "scope of employment" interpretation of the averments set forth in Plaintiffs' Amended Complaint is dispositive of the sovereign immunity issue. Instead, genuine issues of material fact remain regarding whether or not Defendants were acting within the scope of their employment when they allegedly assaulted and battered Plaintiffs and the determination of these facts must be made by the jury. *See Strothers v. Nassan,* 2009 U.S. Dist. LEXIS 30208, at *27 (W.D. Pa. Apr. 9, 2009)(The question of whether an individual has acted within the scope of his or her employment can be decided as a matter of law by a court only when the facts and the inferences to be drawn from them are not in dispute; it is ordinarily a question of fact for the jury to decide).  Accordingly, Defendants are not entitled to sovereign immunity on the basis of the record currently before this Court.

24

**IV.     Conclusion**

For the reasons set forth hereinabove, Defendants' Motion for Summary Judgment is

hereby granted in part and denied in part.

An appropriate Order follows.

BY THE COURT:

/s/ C. Darnell Jones II      J.